FILED

**UNITED STATES BANKRUPTCY COURT**   FEB 1 8 2010
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**   CLERK U.S. BANKRUPTCY,
ORLANDO DIVISION

In re:

JAMES DAVID WILSON and                       Case No. 6:08-bk-05731-ABB
SARA STANSBERRY WILSON,                       Chapter 7

        Debtors.

_____/

LEIGH RICHARD MEININGER,
TRUSTEE,

        Plaintiff,                              Adv. Pro. No. 6:08-ap-00218-ABB

vs.

GUENTHER-VORRUCKEN, INC.
d/b/a ADVANCED AUDIO DESIGN,

        Defendant.

_____/

## MEMORANDUM OPINION

This matter came before the Court on the Complaint (Doc. No. 1) filed by Leigh

R. Meininger, the Chapter 7 Trustee and Plaintiff herein ("Trustee"), against the

Defendant Guenther-Vorrucken, Inc., d/b/a Advanced Audio Design ("Defendant"),

alleging Defendant breached an employment agreement between the Debtor James David

Wilson ("Debtor") and Defendant. The final evidentiary hearing was held on January 21,

2010 at which the Debtor, the Trustee, Defendant's principal Harold G. Munter, and the

parties' respective counsel appeared. The parties, pursuant to the Court's directive, filed

post-hearing briefs (Doc. Nos. 24, 25).

Judgment is due to be entered in favor of Defendant and against the Trustee for the reasons set forth herein. The Court makes the following findings of fact and conclusions of law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

### *Employment Relationship*

The Debtor, through his company Wilson Technologies, Inc. ("WTI") owned jointly with his wife Sara Stansberry Wilson ("Mrs. Wilson"), designed and installed audio-visual systems in residential and commercial properties in the Central Florida area. WTI's operations were funded primarily by two loans it obtained in July 2006: (i) $115,000.00 pursuant to a U.S. Small Business Administration loan; and (ii) $100,000.00 pursuant to a BankFirst loan (Main Case Doc. No. 11). WTI, to secure its performance of the loans, granted BankFirst a security interest in virtually all of WTI's assets including accounts receivable (Id.).

The Debtor and Mrs. Wilson personally guaranteed the loans and granted BankFirst a security interest in their residence located at 819 Brightwater Circle, Maitland, Florida 32751 ("Residence") and the Debtor's life insurance policy pursuant to the Unconditional Guarantees, Third Party Pledge Agreements, and Mortgage they executed in July 2006 (Id.).

WTI began experiencing financial difficulties in 2007 and the Debtor approached Defendant to discuss whether it had an interest in purchasing WTI. Defendant is a Florida corporation based in Sarasota, Florida that designs and installs audio-visual, lighting, and electronic control/automation systems in residential and commercial properties. It has offices in Naples and Sarasota and services its Tampa customers

2

through the Sarasota office. Harold G. Munter ("Munter") is a fifty-percent owner and the Chief Executive Officer of Defendant.

Defendant did not have the resources to purchase WTI outright, but was interested in formulating a relationship with the Debtor and WTI. Defendant had no business presence in Orlando and the Debtor advised Defendant he could help Defendant establish an Orlando office through his knowledge of the Orlando market and WTI's existing client base.

The Debtor and Munter had a series of meetings during which they negotiated and structured a relationship whereby Defendant would employ the Debtor as a sales consultant in Orlando and the Debtor would continue to service WTI's existing business, consisting of eighteen on-going contracts. Defendant and the Debtor agreed WTI would have no credibility and lose the ability to generate future business if the existing contracts were not completed. Defendant was to supply the labor, at cost, to service WTI's existing business and Debtor was to pay Defendant $5,000.00 per week for the labor. WTI was to retain any profits from on-going contracts and Defendant would receive no share of those profits.

The Debtor and Defendant memorialized their relationship in two written agreements: (i) a Confidentiality and Non-Compete Agreement by and between the Debtor and Defendant executed by the Debtor and Munter as CEO of Defendant on October 29, 2007 ("Non-Compete Agreement") (Tr. Ex. 1); and (ii) a Subcontractor Agreement by and between WTI and Defendant executed by the Debtor on behalf of WTI and Munter as CEO of Defendant on October 29, 2007 (Def. Ex. C).

The Non-Compete Agreement consists of four pages of text and two attachments,

Attachment A and Attachment B (Tr. Ex. 1). It provides in part:

> **1. <u>Work for Corporation</u>.** . . . *Anything hereinabove notwithstanding, I shall be at liberty to devote such time and attention as required to complete certain contracts of Wilson Technologies that are listed on Attachment B hereto without being in violation of this Agreement.*[1]
>
> **6. <u>Non-Solicitation and Non-Competition for Two Years</u>.** . . . *Anything hereinabove notwithstanding, I will not be bound by the terms of the non-competition provisions of this Agreement if my employment is terminated involuntarily by the Corporation for reasons other than willful misconduct, conviction of a crime, acts of dishonesty or willful neglect of duty.*
>
> **9. <u>Term</u>.** This agreement is effective immediately on being signed by both corporation and me. The term of this agreement shall continue until the date that I am not an employee of corporation, which is referred to here as the 'date of termination of my employment.' My obligations under this agreement survive after the date of termination of my employment. *The minimum term of my employment shall be one year unless it is terminated sooner for willful misconduct, conviction of a crime, acts of dishonesty or willful neglect of duty.*
>
> **10. <u>Miscellaneous</u>.** . . . This agreement is not a contract for future employment or employment and does not change the fact that my employment or employment may be terminated at any time by either me or corporation at will, except as may be specifically indicated otherwise in a writing executed by me and corporation. . . . This agreement shall be governed by Florida law. . . . This agreement is intended to be a valid contract under section 542.335 of the Florida [S]tatutes.

Attachment A sets forth the Debtor was to be paid:

    (i)      salary of $1,634.62 per week;

    (ii)    a commission for the period November 1, 2007 through October 31, 2008 based upon a percentage of sales;

    (iii)   a sales percentage override if another sales person was employed and sales exceeded $3,000,000.00;

    (iv)   monthly vehicle allowance of $600.00;

---

[1] The quoted portions of the Non-Compete Agreement contain bolded, italicized language.

> (v)     medical, dental, and eye coverage for the Debtor and family; and
>
> (vi)    conference and travel expenses, if approved in advance by
>         Defendant.

The final line item entitled "All else" states: "See Employee Handbook." No Employee

Handbook was presented. The commission structure contained in Attachment A is based

upon the Debtor's representations to Munter he could generate minimum annual sales of

$1,200,000.00. Attachment B itemizes WTI's existing eighteen contracts.

Defendant engaged counsel to prepare the Non-Compete Agreement and

Subcontractor Agreement. Munter is an attorney, but does not have experience in

employment law matters. Munter presented the proposed agreements to the Debtor and

the Debtor had a family member, who is an attorney, review the documents. The

concluding sentence of Paragraph 9 of the Non-Compete Agreement was requested by

the Debtor and agreed to by Defendant:

> *The minimum term of my employment shall be one year unless it is*
> *terminated sooner for willful misconduct, conviction of a crime, acts of*
> *dishonesty or willful neglect of duty.*

The Debtor, through this inclusion, wanted to prevent Defendant from building

relationships with WTI's clients and then terminating him.

### *Orlando Office Operations*

The Debtor began his employment with Defendant on November 1, 2007. He

managed Defendant's Orlando office and provided sales services in the Orlando area. He

continued to service WTI's existing contracts and Defendant issued weekly invoices to

WTI for labor costs pursuant to the Subcontractor Agreement (Def. Ex. D), which WTI

initially paid. The Debtor was paid a weekly salary and family medical insurance

5

reimbursement pursuant to the Non-Compete Agreement. He did not request payment for a vehicle allowance.

The Debtor and Munter had regular communications regarding the Orlando office's operations. The Orlando office was not profitable. Few new contracts were generated and the projected sales figures were not attained. During the five-month period from November 2007 through March 2008 the Debtor generated sales of approximately $100,000.00.

WTI defaulted on its loan obligations and BankFirst, in early 2008, issued a letter to WTI's customers and area builders instructing all customers to remit payments directly to BankFirst and to not pay WTI or Defendant. WTI stopped paying weekly labor costs to Defendant. The Debtor engaged counsel, the law firm representing the Debtor in his bankruptcy case, to address the BankFirst situation.[2] The Debtor's counsel and Defendant had a series of communications with BankFirst. The parties structured an arrangement whereby BankFirst released funds for payment of WTI's on-going contracts.

The Orlando operations did not improve and the Debtor was increasingly distracted by WTI's and his personal financial problems. WTI, in addition to the BankFirst indebtedness, had substantial unsecured debts, including credit card debts. The Debtor contacted Munter in March 2008 and asked to schedule a meeting.

The Debtor met with Munter at Defendant's Sarasota office on Thursday, March 20, 2008. They met for approximately two hours and had a candid dialogue about the Orlando operations, market conditions, the BankFirst situation, and WTI's inability to pay the weekly labor costs. The Debtor admitted the outlook for the Orlando office was bleak. They discussed various options including increasing marketing efforts. Munter

---

[2] Def. Ex. W, p. 41.

suggested as an option closing the Orlando office, but keeping a sales presence. He asked the Debtor to think about other solutions. The Debtor was intent upon completing the existing WTI jobs.

Munter testified he did not have the intention of closing the Orlando office and it was raised as a possible option, not as the only option. He wanted the Debtor to consider and present other less drastic options. His testimony was credible.

The Debtor and Munter had a telephone conversation the following day, Friday, March 21, 2008, during which the Debtor informed Munter he had no other options to suggest and was talking with other companies about completing WTI's contracts. Munter told the Debtor the Defendant would not impede WTI's ability to complete its contracts with another company, including a competitor company. They mutually agreed to close the Orlando office.

Munter travelled to Orlando and met with the Orlando staff on Monday, March 24, 2008 and informed them the Orlando office would be closed. He met with the Debtor and asked him if he was interested in working for three weeks to wind down the Orlando office. The Debtor declined the offer and advised Munter to hire a Mr. Casey Collins. The Debtor did not inquire about employment opportunities in Defendant's other market areas. The parties did not discuss severance and the Debtor made no breach of contract allegation.

The Debtor sent an email to the Orlando employee Ryan Hibbler on the evening of March 24, 2008 with a copy to Munter stating:

I'm sorry you feel the way you do. When I met with Hal we talked about several options and I was to think about any other options that might be possible and get back with Hal so we could setup a meeting. We talked on Friday and I called Hal this morning and asked him to come over and meet with you guys personally. I think both Hal and I made a decision that is not an easy one by any means, but one that needed to be made.[3]

The Debtor admitted at trial this email accurately recites the events and he and Munter mutually agreed to close the Orlando office. Munter's follow-up email to Ryan Hibbler on March 24, 2008, which was copied on the Debtor, corroborates the events and the closing of the Orlando office was a mutual decision.[4]

Defendant closed the Orlando office. The Debtor did not assist with the closing. WTI ceased operations in March 2008. The Debtor, through bankruptcy counsel, made a demand upon Defendant in May 2008 for alleged unpaid wages and benefits pursuant to Defendant's alleged breach of the Non-Compete Agreement.[5]

BankFirst instituted a foreclosure action in the Florida State Court against WTI, the Debtor, and Mrs. Wilson seeking to foreclose on the Debtor's residence.

### *Bankruptcy Case*

The Debtor and Mrs. Wilson filed a Chapter 7 petition on July 7, 2008, which stayed BankFirst's foreclosure action pursuant to 11 U.S.C. Section 362(a). They had been contemplating bankruptcy since 2007. The Debtor, in 2007 and prior to his employment with Defendant, consulted with bankruptcy counsel.[6] WTI has not filed for bankruptcy protection.

BankFirst obtained relief from the automatic stay and continued the State Court foreclosure proceeding. A Foreclosure Judgment was entered on September 22, 2008 and

---

[3] Def. Ex. F.
[4] Def. Ex. I.
[5] Def. Ex. L, M.
[6] Def. Ex. W, pp. 51-52.

BankFirst is pursuing, or has completed, a foreclosure sale of the Debtor's residence (Main Case Claim No. 17-1).

The Debtor lists as an asset in Schedule B a breach of employment agreement cause of action against Defendant with an unknown value. The cause of action was not claimed as exempt in Schedule C. The Debtor's breach of contract claim constitutes non-exempt property of the estate pursuant to 11 U.S.C. Section 541(a). The Trustee designated this case an asset case.

The Trustee, pursuant to his statutory duties of 11 U.S.C. Section 704(a) to collect and reduce to money the property of the estate, initiated this adversary proceeding against Defendant seeking to recover damages for the alleged breach. He asserts Defendant wrongfully terminated the Debtor in violation of Paragraph 9 of the Non-Compete Agreement and the Debtor has suffered damages of at least $56,000.00, plus interest, for lost wages, commissions, monthly vehicle allowance, and family medical, dental, and eye insurance for the seven-months remaining of the Debtor's one-year employment term.

Defendant asserts various defenses to the Complaint: (i) the Agreement is not enforceable because it is not for a definitive term; (ii) Defendant and Debtor mutually agreed to part ways; and (iii) Debtor was distracted by personal financial issues and willfully neglected his duties owed to Defendant. Defendant asserts the Court may consider evidence outside of the four corners of the Non-Compete Agreement.

The parties agree the core issues for determination are whether the Non-Compete Agreement constitutes a binding, enforceable employment contract pursuant to Florida State law and, if so, whether Defendant breached the contract.

*Analysis*

The Non-Compete Agreement is governed by Florida State law pursuant to Paragraph 10 (Tr. Ex. 1). The general rule in Florida is that an "employment contract which does not contain a definite term of employment is terminable at the will of either party without cause." Roy Jorgensen Assocs., Inc. v. Deschenes, 409 So.2d 1188, 1190 (Fla. 4th DCA 1982). "However, when a contract for employment provides a definite duration, the employment contract is enforceable." Story v. Culverhouse, 727 So.2d 1128, 1130 (Fla. 2d DCA 1999).

The entirety of the Non-Compete Agreement is relevant in determining whether a provision is "merely language of expectation" or constitutes a definite period of employment. Roy Jorgensen Assocs., Inc., 409 So.2d at 1190. Where an agreement does not contain an express statement as to duration, a Court may examine the surrounding circumstances to determine the parties' intent. Iniguez v. American Hotel Register Co., 820 So.2d 953, 956 (Fla. 3d DCA 2002).

The Non-Compete Agreement is internally inconsistent regarding an employment term. Some provisions suggest an indefinite duration and others set forth a definite term:

(i)     Paragraph 10 sets forth the relationship is an "at will relationship where either party can terminate the relationship."

(ii)    Paragraph 9, in contrast, sets forth a minimum employment term of one year and limits Defendant's ability to terminate the Debtor during that term.

(iii)   Attachment A sets forth a salary of $1,634.62 per week" with no time period, but the commission is only to be paid "[f]or the period November 1, 2007 – October 31, 2008."

(iv)    The "Other Compensation" provision of Attachment A has no time period.

> (v)  The Debtor is to receive vacation of "15 days per year."
>
> (vi)  An Annual Review is to be conducted "[o]n or about November 1 of each year.

Tr. Ex. 1.

The Non-Compete Agreement, based upon an examination of the document as a whole, could be construed as an agreement for a definite term pursuant to Florida State law:

> (i)  Paragraph 9 sets forth a minimum term of one year.
>
> (ii)  The remuneration for the one-year term is specified in Attachment A whereby the Debtor was to receive commissions on sales for the period November 1, 2007 through October 31, 2008.
>
> (iii)  The Non-Compete Agreement does not provide for any commission payments after October 31, 2008.
>
> (iv)  The start date of employment is clearly identifiable: "This agreement is effective immediately on being signed by both corporation and me." The agreement was signed by Defendant and the Debtor on October 29, 2007.

The Non-Compete Agreement has a definite starting date and term of employment pursuant to Paragraph 9 and Attachment A. It could be deemed an employment contract for a definite duration pursuant to Florida State law. Story, 727 So.2d at 1130.

The Non-Compete Agreement, based upon an examination of the document as whole, could also be construed as an agreement for an indefinite term pursuant to Florida State law. Roy Jorgensen Assocs., Inc., 409 So.2d at 1190. The concluding sentence of Paragraph 9 could be construed as language of expectation whereby the parties intended one year would be the minimum employment period with the relationship to continue indefinitely thereafter. The Salary, Other Compensation, Vehicle Allowance, Vacation,

and Annual Review provisions of Attachment A, particularly with the "each year" language, support a finding the parties intended their relationship to be indefinite.

The extrinsic evidence, in particular the Debtor's reason for insisting on the inclusion of the concluding sentence of Paragraph 9, suggests the parties intended one year would be the minimum employment period with the relationship to continue indefinitely thereafter.

Whether the Non-Compete Agreement is an enforceable employment agreement for a definite term or an "at will" agreement, the result is the same. The Trustee has not established Defendant committed a breach that resulted in damages to the Debtor.

If the Non-Compete Agreement is an enforceable employment agreement pursuant to Florida State law, then Paragraph 9 is an enforceable, binding provision. The Debtor's initial employment term, pursuant to the plain and unambiguous language of Paragraph 9, was one year and he could only be *terminated sooner for willful misconduct, conviction of a crime, acts of dishonesty or willful neglect of duty.*" The operative word of this provision is "terminated." Defendant would be in breach of Paragraph 9 if it unilaterally terminated the Debtor's employment for a reason other than his willful misconduct, conviction of a crime, acts of dishonesty or willful neglect of duty.

The word "terminated" is not defined in the Non-Compete Agreement. "In employment agreements, as with all contracts, courts must apply the 'most commonly understood meaning' with respect to the subject matter and circumstances of the contract." St. Johns Inv. Mgmt. Co. v. Albaneze, 22 So.3d 728, 731 (Fla. 1st DCA 2009)

(*citation omitted*).  "In addition, to give proper meaning to a specific contract provision, a court must consider it in the context of the entire contract."  Id. at 732.

The plain and ordinary meaning of words contained in an employment contract can be ascertained by reference to Black's Law Dictionary.  Andrx Therapeutics, Inc. v. Mallinkrodt, Inc., No. 06-60210-CIV, 2007 WL 1362778, at *3 (S.D. Fla. May 9, 2007). "Terminated" is commonly defined in relation to an employment agreement as:  "The complete severance of an employer-employee relationship."  BLACK'S LAW DICTIONARY, 1609 (9th ed. 2009).  This commonly understood definition of "terminated" applies to the concluding sentence of Paragraph 9 of the Non-Compete Agreement pursuant to the rules of contract construction.  St. Johns Inv. Mgmt. Co., 22 So.3d at 731.

Termination, based upon the common definition of "terminated" and a reading of the plain and unambiguous language of Paragraph 9, is a unilateral action by Defendant that completely severs its employer-employee relationship with the Debtor.  "When the parties to a contract have agreed to a termination clause, the clause should be enforced as written."  Andrx Therapeutics, Inc., 2007 WL 1362778, at *3.  The terms of the Non-Compete Agreement, including Paragraph 9, were negotiated by the Debtor and Defendant.  They voluntarily entered into the Non-Compete Agreement and are bound by its terms.  Brooks v. Green, 993 So.2d 58, 61 (Fla. DCA 1st 2008).

The Trustee asserts Defendant wrongfully terminated the Debtor in breach of Paragraph 9 of the Non-Compete Agreement.  No breach of Paragraph 9 occurred because the Defendant did not terminate the Debtor.

The Debtor and Defendant met and candidly discussed the poor performance of · the Orlando office and WTI's financial difficulties.  They discussed various options,

including, but not limited to, closing the Orlando office. Defendant asked the Debtor to consider and present other options. The Debtor presented none. Defendant offered the Debtor continued employment through assisting with the winding-down of the Orlando office. The Debtor declined the offer and did not pursue any continued employment opportunities with Defendant. Defendant and Debtor mutually agreed to close the Orlando office and went their separate ways.

Defendant did not breach Paragraph 9 of the Non-Compete Agreement because it did not terminate the Debtor. It did not unilaterally sever the employment relationship. Defendant and the Debtor mutually agreed to end their relationship and the Debtor rejected Defendant's offer of continued employment.

No breach occurred if the Non-Compete Agreement constitutes an "at will" employment agreement. Either party could unilaterally terminate the relationship at any time for any reason and the Non-Compete Agreement, including Paragraph 9, is unenforceable. Roy Jorgensen Assocs., 409 So.2d at 1190; J.R.D. Mgmt. Corp. v. Dulin, 883 So.2d 314, 317 (Fla. DCA 4th 2004) ("So it is true that one may not sue for breach of at-will employment.").

### Conclusion

Whether the Non-Compete Agreement is construed pursuant to Florida State law as an enforceable employment contract for a definite term or as an "at will" contract, there was no breach of the Non-Compete Agreement by Defendant. If the parties' relationship was an "at will" employment relationship, Paragraph 9 was not binding and the parties were each free to terminate the relationship unilaterally at any time and for any reason.

If the Non-Compete Agreement constitutes an employment contract for a defined term, the parties were bound by its terms, including the provisions of Paragraph 9. A breach of contract claim could only be maintained where Defendant "terminated" the Debtor in violation of the terms of Paragraph 9. Defendant, based upon the plain and unambiguous language of Paragraph 9, did not terminate the Debtor. The parties mutually agreed to end their relationship. Defendant did not terminate their relationship. Defendant did not breach the Non-Compete Agreement. Judgment is due to be entered in favor of Defendant and against the Trustee.

A separate judgment consistent with these findings of fact and conclusions of law shall be entered contemporaneously.

Dated this _18th_ day of February, 2010.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge